Filed 4/30/15

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C074019 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F04362) |
| v. | |
| LAWRENCE JACKIO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael A. Savage, Judge. Affirmed as modified.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II through IX.

1

Convicted of attempted murder and other crimes associated with a home invasion and sentenced to both determinate and indeterminate terms in state prison, defendant Lawrence Jackio contends on appeal that his waiver of his right to counsel, under which he represented himself at trial, was inconsistent with his Sixth Amendment rights because the trial court did not outline the possible terms of imprisonment for the various crimes and enhancements charged against him. Instead, the trial court simply advised defendant that he risked life in prison if he was convicted.

In the published part of this opinion, we conclude that, under the circumstances, the trial court's advisement adequately warned defendant of the risks of self-representation.

In the unpublished part of this opinion, we find no merit in defendant's remaining contentions. We therefore affirm the judgment but remand to the trial court to correct a clerical error in the abstract of judgment.

## FACTS

We recount the evidence in the light most favorable to the jury's verdicts. For example, even though neither of the victims was able to identify defendant as one of the assailants, we refer to him by name from the outset because there was ample evidence that he was one of the assailants.

Early in the morning on June 16, 2011, defendant and Rashid Deary-Smith entered the garage of a house where Martez Laster and Antonia Branch lived together with their one-year-old son. Between 2:00 and 3:00 a.m., Branch, who had been out that night, approached the residence in her car with her son in the backseat. She opened the garage door with a remote control from her car and drove into the garage. In the garage, Branch closed the garage door with the remote control and went around her car to get her son out of the backseat. Defendant and Deary-Smith approached her, pointed guns at her, and told her to open the door leading into the house. One of the men, probably Deary-Smith,

2

hit Branch in the head with his gun, opening up a wound that required five staples to close.

Laster, who was inside the house, heard the commotion in the garage and grabbed his .40-caliber handgun. He went to the door that connects the garage to the interior of the house, unlocked it, and began to open it. As he was opening the door, he was rushed by defendant and Deary-Smith. Laster took a couple steps back and was shot in the side, so he returned fire. Defendant and Deary-Smith retreated into the garage.

Both defendant and Deary-Smith had been hit by gunfire from Laster. Deary-Smith was hit in the head and fell to the floor of the garage, and defendant, who was hit in the leg, escaped out the side door of the garage. Meanwhile, Branch got back into her car, put the car in reverse, and backed up through the closed garage door.

A neighbor saw defendant flee. Defendant limped along, leaving a trail of blood and dragging himself to a car. He got into the car and drove away. A subsequent medical examination revealed that defendant was hit twice in the leg, with one of the bullets breaking his femur. Defendant had gunshot residue on his hands and pants. And the DNA in the trail of blood from the house to the car matched defendant's DNA profile. Also along the trail of blood between the house and the car, defendant dropped a nine-millimeter handgun.

When law enforcement arrived at the house, Deary-Smith was still on the floor of the garage. He had zip ties in his pocket, and a loaded .45-caliber semiautomatic handgun was on the ground next to his head. No spent .45-caliber casings were found at the house – evidence that Deary-Smith did not fire the gun. Separate DNA samples from the gun matched Deary-Smith's and Branch's DNA profiles.

Later that day, when the owner of the car that defendant had driven away from the house looked into her car, she found blood and defendant's wallet. The blood was also identified as defendant's through DNA testing.

3

Two expended casings from a nine-millimeter gun were found, one in the house and one in the garage. They matched the gun left by defendant as he dragged himself to the car after the shootings.

Defendant testified in his own defense. He admitted that he was at the house in question when the gunfire erupted. He claimed, however, that he had taken Deary-Smith there to meet Deary-Smith's cousin. While defendant was waiting in front of the house, he saw someone back out through the garage door, heard gunshots, and realized he had been hit. He dragged himself to the car and drove away.

PROCEDURE

A jury convicted defendant of first degree burglary (Pen. Code, § 459; count one); two counts of assault with a firearm (Pen. Code, § 245, subd. (a)(2); counts two & four); attempted murder (Pen. Code, §§ 664, 187, subd. (a); count three); two counts of attempted first degree robbery (Pen. Code, §§ 664, 211; counts five and six); and being a felon in possession of a firearm (Pen. Code, § 12021, subd. (a)(1); count seven). The jury also found true various arming, discharge, and great bodily injury allegations. In a bifurcated proceeding, the trial court found that defendant had a prior serious felony conviction. The court sentenced defendant to a determinate term of 19 years four months in state prison, with a consecutive indeterminate term of 50 years to life.

Additional facts and proceedings are recounted as they are relevant to the discussion of defendant's contentions on appeal.

DISCUSSION

I

Faretta *Waiver*

Before trial, defendant decided to represent himself, which prompted the trial court to warn defendant of the dangers of self-representation, including the possibility that he faced, in the trial court's words, "life in prison." Defendant contends that, when he moved to represent himself, the trial court failed to give him an adequate breakdown

4

of what punishment he was facing if convicted.  He argues that, under these circumstances, his waiver of the right to counsel was not knowing and voluntary under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562] (*Faretta*).

Defendant's contention raises two issues.

First, what notice does the Sixth Amendment require concerning the penalty faced if the defendant is convicted?  Does it require a breakdown of the full range of sentencing options with respect to the crimes and enhancements charged?  Or does it simply require the court to notify the defendant concerning the maximum penalty he faces?  We conclude that it is the latter – that the court need notify the defendant only of the maximum penalty he faces.

And second, did the trial court's waiver colloquy in this case adequately notify this defendant of the maximum penalty he faced if convicted?  We conclude that, by informing defendant that he faced life in prison as a penalty for the crimes and enhancements charged, the court adequately notified defendant of the possible penalty he faced if convicted.

Because the trial court's advisement concerning the penalty was adequate, defendant's waiver of the right to counsel was knowing and voluntary, and there was no violation of his Sixth Amendment right to counsel.

A.     *Procedural Background*

On March 23, 2012, defendant signed a *Faretta* waiver form which included the following statement:  "Penalties for offense if found guilty are <u>life in prison</u>."  The underlined part of the statement was handwritten.  After a preliminary hearing on April 16, 2012, however, defendant requested and was granted appointment of counsel.

On May 18, 2012, defendant appeared before the court on a new *Faretta* motion. Defendant said that he was a high school graduate and had finished almost a year of college.  The court went through the normal litany of admonitions about representing

oneself in a criminal action. (Defendant does not claim on appeal that the admonitions were deficient, except as discussed here.) The relevant colloquy is as follows:

"THE COURT: . . . You do understand the penalties for the offenses for which you've been charged could carry up to a life sentence[?] [¶] *Do you understand that*?

"THE DEFENDANT: *Yes*." (Italics added.)

The court provided another *Faretta* waiver form, which defendant signed, with the following statement: "Penalties for offense if found guilty are <u>life</u>." Again, the underlined portion was handwritten. The form listed the code sections for the crimes charged in the information, but it did not list any code sections for enhancements.

The court found that defendant had made a knowing and voluntary waiver of his right to counsel.

B.      *Sixth Amendment Jurisprudence*

The Sixth Amendment of the United States Constitution guarantees a defendant both (1) the right to be represented by counsel at critical stages of the prosecution and (2) the right to represent himself, if he so elects. (*Faretta, supra,* 422 U.S. at p. 819; *People v. Koontz* (2002) 27 Cal.4th 1041, 1069 (*Koontz*).) However, we must indulge every reasonable inference against a defendant's waiver of the right to counsel. (*Brewer v. Williams* (1977) 430 U.S. 387, 404 [51 L.Ed.2d 424]; *Koontz, supra,* 27 Cal.4th at p. 1069.)

A valid waiver includes: (1) a determination by the court that the defendant has the mental capacity to understand the proceedings (which is not an issue in this case) and (2) a finding that the waiver is knowing and voluntary, which entails a finding that the defendant understands the consequences of the decision and is not being coerced. (*Godinez v. Moran* (1993) 509 U.S. 389, 400-401 & fn. 12 [125 L.Ed.2d 321, 332-333]; *Koontz, supra,* 27 Cal.4th at pp. 1069-1070.)

"In order to make a valid waiver of the right to counsel, a defendant 'should be made aware of the dangers and disadvantages of self-representation, so that the record

6

will establish that "he knows what he is doing and his choice is made with eyes open." [Citation.]' (*Faretta, supra,* 422 U.S. at p. 835.) No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation; the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case. [Citation.]" (*Koontz, supra,* 27 Cal.4th at pp. 1070.)

Our role on appeal after a defendant has defended himself under *Faretta* and now claims that his waiver of the right to counsel was made without being adequately advised of the dangers and disadvantages of self-representation is to examine the whole record to determine de novo whether the waiver was valid. (*Koontz, supra,* 27 Cal.4th at pp. 1070.)

 C. *Analysis*

  1. What does the Sixth Amendment require?

As noted, defendant was warned that he could be sentenced up to life in prison if convicted. On appeal, he claims, however, that the advisement was inadequate because the trial court was required to advise him of the full range of punishments he could face for the crimes and enhancements charged.

Defendant relies primarily on a decision of the Ninth Circuit of the United States Court of Appeals in making his contention that the advisements here were inadequate. But we are not bound by that decision. (*People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3.) Therefore, although we will discuss the Ninth Circuit decision later, we start with the jurisprudence of the California Supreme Court and the United States Supreme Court.

No case of the California Supreme Court directly answers the specific question posed in this case: whether a defendant wishing to represent himself at trial must be advised of the full range of punishments he could face if convicted. However, in 2002, the court held that a trial court did not err in giving advisements when it instructed a defendant who wanted to represent himself at trial that he faced the death penalty.

7

(*Koontz, supra,* 27 Cal.4th at pp. 1069-1073.) Obviously, the sentence could have been life without parole, even if he was convicted of all the crimes, because the death penalty is not mandatory for any crime in California. (See Pen. Code, § 190.) But in *Koontz*, the court did not discuss specifically the advisement concerning the possible penalty if the defendant was convicted. Instead, it rejected the defendant's contentions that (1) the trial court did not adequately warn him of the disadvantages of not having an attorney represent him and (2) the defendant was mentally unfit to comprehend the risks of representing himself. (*Koontz, supra,* 27 Cal.4th at pp. 1072-1073.) A case is not authority for a proposition not considered. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2.)

A 2009 California Supreme Court case summarized the law generally applicable in these circumstances:

" 'A defendant seeking to represent himself "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation]." (*Faretta, supra*, 422 U.S. at p. 835.) "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation." [Citation.] Rather, "the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." [Citations.]' [Citation.] Thus, '[a]s long as the record as a whole shows that the defendant understood the dangers of self-representation, no particular form of warning is required.' [Citations.]" (*People v. Burgener* (2009) 46 Cal.4th 231, 240-241 (*Burgener*).)

Likewise, no decision of the United States Supreme Court answers the specific question presented by defendant here. However, in 2004, the high court provided guidance concerning the necessary advisements in a different procedural setting – when a

8

defendant desires to represent himself to enter a guilty plea. (*Iowa v. Tovar* (2004) 541 U.S. 77 [158 L.Ed.2d 209] (*Tovar*).)

In *Tovar*, the defendant said during pretrial proceedings that he wanted to represent himself and to plead guilty. The trial court engaged in a guilty plea colloquy, advising the defendant of the rights he must waive to plead guilty, but the court did not advise the defendant under *Faretta* of the dangers and disadvantages of self-representation. The Iowa Supreme Court found that the trial court's advisements were deficient because the court did not warn the defendant that by representing himself he might overlook viable defenses and would not have the opportunity to obtain an independent opinion of whether he should plead guilty. (*Tovar, supra,* 541 U.S. at pp. 81-84.)

On review, the *Tovar* court held that the advisements required by the Iowa Supreme Court are not required by the Constitution. Instead, "[t]he constitutional requirement is satisfied when the trial court informs the accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of *the range of allowable punishments attendant upon the entry of a guilty plea*." (*Tovar, supra,* 541 U.S. at p. 81, italics added.)

The *Tovar* court emphasized that the central component for a valid waiver is that the defendant knows what he is doing because he has been warned of the hazards ahead. But there is no prescribed script. (*Tovar, supra,* 541 U.S. at pp. 88-89.)

The difference in procedural settings of this case and *Tovar* is significant. In *Tovar*, the defendant was pleading guilty. Here, a trial lay ahead.

*Tovar*'s requirement that a defendant desiring to represent himself to enter a guilty plea be advised of "the range of allowable punishments attendant upon the entry of a guilty plea" cannot practically be applied to a defendant desiring to represent himself at trial. The essential difference is that, while in a guilty plea setting the crimes and enhancements for which the defendant can be punished are known, in a case such as ours

9

where the defendant is going to trial the jury may or may not convict the defendant of the crimes or find true the enhancement allegations. This makes it impractical to try to predict the possible terms and enhancements that will eventually be available to the trial court at sentencing.

When a defendant represents himself, he may be acquitted, which means he will not be subject to punishment. On the other hand, he may be convicted of all the crimes charged, with true findings on all the enhancements. In that case, the court may impose the maximum punishment for the crimes and enhancements charged. Also, the jury may convict on some counts and acquit on others or convict of lesser included crimes, and the jury may do the same with the enhancement allegations. If the defendant is convicted and enhancements are found true, the court may strike or stay some of the punishment or select lower terms. In other words, a requirement that a trial court advise a defendant desiring to represent himself at trial of the full range of possible punishments would require the trial court to start with no punishment for acquittal and work its way through the virtually endless permutations and combinations of terms, ending with the maximum possible punishment. Merely to state it demonstrates the unworkability of requiring the court to advise the defendant as to every possible punishment.

Instead, the most reasonable solution consistent with case law and the Constitution is to require the trial court to advise a defendant desiring to represent himself at trial of the maximum punishment that could be imposed if defendant is found guilty of the crimes, with enhancements, alleged at the time the defendant moves to represent himself. By so advising, the trial court puts the defendant on notice that, by representing himself, he is risking imposition of that maximum possible punishment. The defendant who decides to represent himself after this advisement proceeds with his " 'eyes open' " and understands the dangers of self-representation, at least with respect to the possible punishment. (*Faretta, supra,* 422 U.S. at p. 835; *Burgener, supra,* 46 Cal.4th at p. 241.) Neither the Constitution nor interpretive case law requires more.

10

2.      Was the advisement in this case adequate?

With this understanding, that an advisement of the maximum possible punishment satisfies the Constitution's requirements with respect to a *Faretta* colloquy, we turn to the advisement given in this case. Defendant contends that it was deficient because the trial court's statement that he faced life in prison was ambiguous. We disagree.

On appeal, defendant argues: "The court's advisement that [defendant] faced[] 'life' is too ambiguous in light of the various meanings of life, as well as the fact that [defendant] was in fact facing onerous 25-to-life sentences, along with doubled sentences under the Three Strikes statutes."

The focus of our review of the adequacy of a specific *Faretta* advisement is what the defendant understood from the advisement. (See *People v. Welch* (1999) 20 Cal.4th 701, 733.) We conclude that the advisement here successfully apprised defendant that, if he were convicted, he could spend the rest of his life in prison.

Three statements are at issue here. The first *Faretta* waiver form instructed defendant that "[p]enalties for offense if found guilty are life in prison." Later, during the second *Faretta* proceedings, defendant expressly stated that he understood he could be sentenced "up to a life sentence." And finally, the second *Faretta* waiver form instructed defendant that "[p]enalties for offense if found guilty are life."

These statements, taken together, were clear that defendant's punishment could amount to "life in prison," meaning incarceration for the rest of his life. Nothing in the record leads us to conclude otherwise.

However, defendant asserts that, because a "life" term under California law can mean so many different things, we must conclude that the advisement was ambiguous and did not successfully convey to defendant that a conviction might result in incarceration for the rest of his life.

Defendant seeks to equate the court's use of the term "life" with the statutory indeterminate term of life with parole, which allows for parole after seven years. Penal

11

Code section 3046 provides that a prisoner "under a life sentence" may be paroled after seven years. But defendant gives no good reason for us to believe that he reasonably understood the court's advisement to refer to Penal Code section 3046. The advisement did not refer to that code section but instead made a very simple statement about the length of time defendant could be incarcerated.

We also see no relevance of the fact that defendant was facing possible determinate and indeterminate terms or that he could be subject to consecutive terms of 25 years to life for the firearm discharge allegations. Defendant argues that the trial court was required to provide these details, but the Constitution does not require an advisement concerning these permutations and combinations, as we already discussed.

Finally, we consider defendant's primary cited authority – *United States v. Erskine* (9th Cir. 2004) 355 F.3d 1161 (*Erskine*). That Ninth Circuit decision is different on its facts and distinguishable on the law, in addition to not being binding on us. In *Erskine*, the trial court mistakenly informed the defendant during a *Faretta* colloquy that he faced a possible one-year incarceration, even though it was possible that the punishment for his crimes would be five years. (*Id*. at p. 1165.) The Ninth Circuit held that it could not conclude that the defendant's *Faretta* waiver was knowing and voluntary because of this error in the *Faretta* colloquy. (*Erskine, supra,* 355 F.3d at p. 1171.) Here, on the other hand, there was no error in the *Faretta* colloquy; therefore, the holding of *Erskine* does not support reversal in this case.

We conclude that the *Faretta* colloquy in this case did not violate defendant's Sixth Amendment right to counsel.

II

*Sufficiency of Evidence of Gun Discharge and Personal Infliction of Injury*

The jury found that, in connection with his attempted robbery of Branch (count five), defendant personally and intentionally discharged a weapon (Pen. Code, § 12022.53, subd. (c)) and personally and intentionally discharged a weapon causing

12

great bodily injury (Pen. Code, § 12022.53, subd. (d)). Defendant contends that the evidence was insufficient to sustain these enhancements because there was no evidence that he shot at Branch or that her injuries constituted great bodily injury. The contention is without merit because it is based on a false premise – that is, that the true findings on these enhancements required that defendant shot at Branch and inflicted on her great bodily injury. To the contrary, defendant's shooting at Laster and inflicting great bodily injury on him was sufficient because defendant did so in the course of his attempted robbery of Branch. (*People v. Frausto* (2009) 180 Cal.App.4th 890, 897-903 (*Frausto*).) In his reply brief, defendant invites us to disagree with the 2009 holding in *Frausto*. We decline.

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" ' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.) We must accept any reasonable inference the jury might have drawn from the evidence. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

In *Frausto*, the court held that, where a defendant was convicted of one count of murder and two counts of attempted murder, the death of one victim supported imposition of the Penal Code section 12022.53 enhancement with respect to the attempted murder of the other two victims because "[a] reasonable trier of fact could find that the shootings were part of one continuous transaction." (*Frausto, supra,* 180 Cal.App.4th at p. 903.) The court relied on *People v. Oates* (2004) 32 Cal.4th 1048, 1052-1056, which held that a single injury supports multiple Penal Code section 12022.53, subdivision (d) enhancements because the enhancement applies to the great

13

bodily injury or death of "any person" and is not limited to the harm done to a particular victim.

Here, defendant's crimes were part of one continuous transaction. Therefore, his shooting of Laster, with resulting great bodily injury, sufficed to sustain the enhancements for discharging a firearm and inflicting great bodily injury as to the attempted robbery of Branch.

III

*Sufficiency of Evidence of Assault and Attempted Robbery*

Defendant contends that, because there was no aiding and abetting instruction and there was no evidence that he personally assaulted Branch, the evidence was insufficient to sustain the jury's verdict that he assaulted Branch with a firearm (count two) and intended to rob her (count five). To the contrary, there was evidence that he personally assaulted Branch with a firearm and intended to rob her.

A.      *Assault with a Firearm*

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240.) "Assault with a deadly weapon can be committed by pointing a gun at another person [citation], but it is not necessary to actually point the gun directly at the other person to commit the crime." (*People v. Raviart* (2001) 93 Cal.App.4th 258, 263.)

After Branch got out of her car in the garage, two men with guns approached her. She testified that she saw them "pull weapons to [her] head." One of the men told her to open the door, then he hit her in the head with his gun. Branch also testified that the one who pistol-whipped her was the one who got away, not the one who was shot and remained in the garage, although she said that it was "very possible" that she was wrong about that.

Despite this evidence, defendant asserts that the evidence was insufficient because Branch could not identify him as one of the assailants and her DNA was found on the gun

14

that lay next to Deary-Smith on the floor of the garage after defendant had fled. This argument merely highlights conflicting testimony. The evidence, as a whole, established that defendant and Deary-Smith were the two men in the garage. And Branch's testimony that the men pointed their guns at her head was sufficient to sustain the conviction for assault with a firearm.

B.    *Intent to Rob*

Intent to take personal property in possession of another is an element of attempted robbery. (Pen. Code, §§ 211, 664.) This intent need not be directly proved but may be inferred from all of the circumstances of the case. (*People v. Gilbert* (1963) 214 Cal.App.2d 566, 567.)

Defendant argues: "In the instant case, there are only unsupported speculative assumptions that the perpetrator's intent in this count was to rob Branch, who was never asked to turn over any property. There were no demands for money or property, and no facts suggested that the perpetrator's intent was to do anything but get her unexpected presence resolved, so they could go forward with the apparent intent to enter the residence."

The evidence was sufficient that defendant intended to take personal property from Branch, as she was in her own residence during the time of the crimes. A person's personal property in the residence may be in that person's immediate possession even if the property is in a different room because the person exercises some physical control over the property. (*People v. Gomez* (2008) 43 Cal.4th 249, 257.) Here, the jury could have reasonably inferred that defendant and Deary-Smith were trying to get into the house to commit theft. Indeed, there seems to be no other motive for the attempt to get into the house. Also, zip ties were found in Deary-Smith's pocket, indicating an intent to subdue the residents while defendant and Deary-Smith committed the theft. Under this factual scenario, it was unnecessary for defendant to attempt to take anything that Branch was carrying with her.

15

The evidence that he intended to rob Branch was sufficient.

IV

*Sufficiency of Proximate Cause Evidence*

Defendant contends that the evidence was insufficient to sustain the Penal Code section 12022.53, subdivision (d) enhancements on the attempted murder (count three) and attempted robbery (count six) of Laster because the causation requirement was not met. This contention is frivolous.

Penal Code section 12022.53, subdivision (d) provides for a sentencing enhancement of 25 years to life if the defendant "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . to any person other than an accomplice . . . ."

Defendant claims that the jury could not rationally conclude that he was the one who shot Laster. To the contrary, the evidence showed that: (1) defendant had a nine-millimeter handgun, while Deary-Smith had a .45-caliber handgun, (2) two nine-millimeter casings were found at the scene, while no .45-caliber casings were found, (3) defendant had gunshot residue on his hands, and (4) Laster was shot by one of the assailants. Under this factual scenario, the jury easily inferred that defendant shot Laster.

Defendant cites *People v. Bland* (2002) 28 Cal.4th 313 for the proposition that, where there are two assailants and it cannot be determined who shot the victim, there is insufficient evidence to sustain the enhancement for personally discharging the firearm and inflicting great bodily injury. (*Id*. at pp. 337-338.) But reference to *Bland* is unhelpful to defendant because, here, the evidence established that defendant shot Laster.

V

*Duty to Instruct on Third Party Culpability*

Defendant contends that, because his defense at trial was that someone else committed the crimes, the trial court had a duty to instruct the jury on third party

16

culpability, even though he did not request the instruction. The contention is without merit because the trial court did not have a duty to give the instruction sua sponte.

The California Supreme Court has repeatedly rejected this contention. A trial court does not have a sua sponte duty to instruct regarding third party culpability where, as here, the jury is instructed that: (1) a defendant is presumed innocent, (2) the prosecution must prove the defendant's guilt beyond a reasonable doubt, and (3) the defendant is entitled to a verdict of not guilty if the jury has reasonable doubt regarding his guilt. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 823-825; *People v. Abilez* (2007) 41 Cal.4th 472, 516-517.)

The trial court did not err.

VI

*Admission of Prior Bad Acts*

The trial court admitted evidence of defendant's prior crimes to impeach his testimony. On appeal, defendant contends that the prior crimes evidence was improperly admitted under Evidence Code section 1101, subdivision (b). We conclude that the evidence was not admitted under Evidence Code section 1101, subdivision (b), and, therefore, the contention is without merit.

A.    *Background*

"Evidence Code section 1101, subdivision (b), points out that uncharged conduct can be relevant and admissible to prove some fact other than propensity, such as motive or intent. [Citation.]" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1096.) Independent of Evidence Code section 1101 admissibility, the California Constitution allows use of relevant evidence, including crimes of moral turpitude, to impeach a witness. (Cal. Const., art. I, § 28, subd. (f)(2)&(4); *People v. Wheeler* (1992) 4 Cal.4th 284, 290-295.)

In its trial brief, the prosecution signaled its intent to introduce evidence of prior crimes defendant had committed. The purpose of the evidence would be to show intent,

17

motive, and absence of mistake under Evidence Code section 1101, subdivision (b). The proposed evidence included five incidents (in the order presented by the prosecution):

- in July 2009, defendant committed burglary (Pen. Code, § 459), for which he was convicted;

- in March 2009, defendant's palm print was found on a stolen keyboard after Deary-Smith and others were arrested in connection with a burglary, for which defendant faced charges that were later dropped in connection with defendant's guilty plea on the July 2009 burglary;

- in November 2007, defendant (as a juvenile) committed a burglary, for which a wardship petition was sustained;

- in January 2007, defendant (as a juvenile) committed burglary, for which a wardship petition was sustained; and

- in July 2005, defendant (as a juvenile) broke into a home where he believed marijuana was kept, for which a petition was filed but ultimately dismissed.

At a pretrial hearing, the trial court asked defendant whether he objected to admission of evidence of his prior crimes, and defendant responded, "Yes." The trial court then deferred a ruling on the matter, saying that, if defendant proffered the defense that he just happened to be walking past the house and got shot, then the prior crimes evidence could be relevant to his intent.

Before defendant testified, the prosecution moved to impeach defendant's credibility as a witness with the five acts summarized in the trial brief and an additional 2005 robbery defendant (as a juvenile) committed using a firearm, for which a wardship petition was sustained. Defendant objected to the use of the juvenile adjudications, and the trial court ruled that they were admissible for impeachment purposes because, among other things, they were crimes involving moral turpitude.

18

The prosecutor asked the court whether the six crimes would also be admissible under Evidence Code section 1101, subdivision (b), but the court declined to rule on that until later.

During cross-examination of defendant, the prosecutor asked defendant about the six crimes. Defendant confirmed some of the details but denied or was evasive about others. In its rebuttal case, the prosecution introduced other details, in response to defendant's denials and evasiveness.

During closing argument, the prosecutor did not argue to the jury that defendant's prior crimes were relevant to his intent, motive, or absence of mistake. However, at the end of the argument, the prosecutor said to the jury: "And the overwhelming weight of the evidence suggests that [defendant] was acting in conformity with what you know about him, and that his conduct after this crime does not support his theory, and that his statement to law enforcement close in time to these events in no way corroborates his theory."

In the jury instruction conference, the trial court said that Evidence Code section 1101, subdivision (b) had "arguably" been introduced, and it advised the parties to think about whether they wanted to request the CALCRIM instruction in that regard. (See CALCRIM No. 375.) Later, the prosecutor informed the court that he was not requesting the court to instruct using CALCRIM No. 375, and the trial court noted that the prosecution had not argued that the prior crimes helped establish intent under Evidence Code section 1101, subdivision (b). So the trial court did not give the instruction. Instead, the trial court instructed the jury on how to use the prior crimes evidence to evaluate defendant's credibility. It informed the jury that it could use prior crimes or misconduct evidence "only in evaluating the credibility of the witness's testimony." (CALCRIM No. 316.)

19

B.    *Analysis*

Defendant contends on appeal that the evidence of his prior crimes was improperly admitted under Evidence Code section 1101, subdivision (b).  Our review of the proceedings, however, reveals that the evidence was not admitted under Evidence Code section 1101, subdivision (b).  The court recognized as much, and for that reason agreed not to instruct the jury using CALCRIM No. 375.  Instead, the evidence was admitted as impeachment.  Defendant does not contend that it was improperly admitted for that purpose.  Therefore, his contention that the evidence was improperly admitted under Evidence Code section 1101 is without merit.

Defendant also argues that the prosecutor, as shown by the closing argument, used the prior crimes evidence to establish propensity, which is not allowed by Evidence Code section 1101.  But the trial court did not admit the evidence to show propensity, and, if the prosecutor's argument was improper in that regard, defendant forfeited the issue by failing to object to the argument on that basis.  (*People v. Tully* (2012) 54 Cal.4th 952, 1037-1038.)

VII

*Admission of Evidence under Evidence Code section 352*

Defendant contends that the trial court erred by not excluding the evidence of his prior crimes under Evidence Code section 352.  He claims that, even though he did not object to the evidence based on Evidence Code section 352, "courts weigh whether to admit evidence under Evidence Code section 1101, subdivision (b) by looking to Evidence Code section 352 . . . ."  This contention is without merit because failure to object based on Evidence Code section 352 forfeits consideration of the issue on appeal.

During the discussion of whether evidence of defendant's prior crimes should be admitted, the trial court asked defendant:  "Do you object to the People putting that evidence on in front of this jury?"  Defendant responded:  "Yes."  The court then analyzed whether the evidence was admissible under Evidence Code section 1101,

20

subdivision (b), but the court and the prosecutor agreed that the issue of whether the prior crimes would be used to show intent, motive, or absence of mistake would be decided later.

Later, the trial court explained to defendant that the prosecutor intended to introduce evidence of defendant's prior crimes to impeach his credibility as a witness. The court then asked: "[A]re you objecting to having [the prosecutor] be allowed to ask you about these – any or all of these crimes while you are testifying?" Defendant responded: "Object to, yes, the juvenile cases." The court then analyzed the admissibility of the prior crimes for impeachment purposes. After concluding that they were admissible for impeachment as crimes of moral turpitude bearing on his credibility, the court continued: "Applying the factors and looking at the case under [Evidence Code] section 352, whether or not the probative value is outweighed by any possible prejudice, I have looked at all the factors, and it seems to me that in determining this defendant's credibility ultimately, that the probative value is extremely high, and it is certainly not outweighed by any possible prejudice, undue consumption of time or substantial danger of confusing or misleading this jury."

Failure to base a timely and specific objection to evidence on Evidence Code section 352 forfeits consideration on appeal of that ground for exclusion. (*People v. Williams* (1997) 16 Cal.4th 153, 206.) Even so, the trial court gratuitously evaluated the six prior crimes proffered for impeachment and concluded that none was unduly prejudicial.

In any event, even considering the issue, the trial court did not abuse its discretion by admitting the prior crimes evidence for impeachment purposes. Defendant's argument in his opening brief completely misses the mark concerning whether the trial court properly admitted the impeachment evidence under Evidence Code section 352 because he claims it was admitted under Evidence Code section 1101. But it was not admitted under Evidence Code section 1101.

21

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

As crimes of moral turpitude, defendant's prior crimes, including multiple burglaries, were highly relevant to his credibility. "The felony convictions of burglary . . . herein necessarily involve moral turpitude. '[Whether] or not the target felony itself evidences a moral defect, burglary remains in all cases the fundamentally deceitful act of entering a house or other listed structure with the secret intent to steal or commit another serious crime inside.' [Citation.] An attempt to do such a fundamentally deceitful act demonstrates the same ' "readiness to do evil." ' [Citation.]" (*People v. Dillingham* (1986) 186 Cal.App.3d 688, 695.) "There is no automatic limitation on the number of priors admissible for impeachment. Moreover, a series of crimes relevant to credibility is more probative than is a single such offense. Thus, whether or not more than one prior felony should be admitted is simply one of the factors which must be weighed against the danger of prejudice. [Citation.]" (*Ibid.*)

Here, as the trial court expressly concluded, any prejudicial effect of the prior crimes evidence was outweighed by (1) the probative value of the multiple crimes of moral turpitude on the issue of defendant's credibility and (2) the trial court's instruction to the jury not to use the evidence for any purpose other than evaluating defendant's credibility. Accordingly, although defendant does not really make the argument in his brief, the trial court did not abuse its discretion under Evidence Code section 352 by admitting the prior crimes as *impeachment* evidence.

VIII

*Instruction on Use of Prior Crime Evidence*

Defendant contends that the trial court erred by not instructing the jury, sua sponte, using CALCRIM No. 375, concerning the permissible use of prior crimes

22

evidence under Evidence Code section 1101. The contention is without merit because, as we discuss above, the evidence was not admitted under Evidence Code section 1101. In fact, the trial court instructed the jury that the only permissible use of the prior crimes evidence was in evaluating a witness's credibility.

## IX

### *Amendment of Abstract of Judgment*

As the Attorney General indicates, a clerical error appears in the abstract of judgment. According to that document, defendant was sentenced to a determinate term of 19 years. However, the determinate term imposed by the court was 19 years four months. We therefore must direct the trial court to correct the abstract of judgment to conform to the sentence imposed by the court. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185-188.)

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the clerical error in the abstract of judgment to conform to the sentence imposed and to send the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


    NICHOLSON    , Acting P. J.


We concur:


    HULL    , J.


    MURRAY    , J.