Filed 10/13/20  P. v. Wafer CA5
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER LEON WAFER,<br><br>Defendant and Appellant. | F075412<br><br>(Super. Ct. Nos. F11900322, F16906924)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Glenda S. Allen-Hill and James Petrucelli, Judges.[†]

Frank J. Torrano, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and F. Matt Chen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P.J., Meehan, J. and DeSantos, J.

[†]    Judge Allen-Hill presided on January 27, 2017, and February 6, 2017; Judge Petrucelli presided over all other hearings pertinent to this appeal.

On December 5, 2016, defendant Christopher Leon Wafer was charged with criminal threats (Pen. Code,[1] § 422 [count 1]); willful infliction of corporal injury upon a cohabitant (§ 273.5, subd. (f)(2) [count 2]); and witness dissuasion (§ 136.1, subd. (b)(2) [counts 3-5]). In connection with count 2, the information alleged he was convicted of spousal battery (§ 243, subd. (e)(1)) on November 20, 2012. On February 17, 2017, following a trial, the jury found defendant guilty as charged.[2] At the March 20, 2017 sentencing hearing, the trial court suspended imposition of sentence for three years and placed defendant on formal probation on the condition he serve concurrent one-year jail terms on each count, inter alia.[3] Defendant filed a notice of appeal on April 3, 2017.

In his opening brief, defendant contended the trial court's grant of his request to represent himself and conduct his own defense pursuant to *Faretta v. California* (1975) 422 U.S. 806 constituted reversible error. In a supplemental brief, he argued for retroactive application of section 1001.36. Under this provision, certain defendants suffering from mental disorders may be eligible for pretrial diversion (§ 1001.36, subd. (a)), defined as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment" (*id.*, subd. (c)). "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (*Id.*, subd. (e).)

---

[1]     Subsequent statutory citations refer to the Penal Code.

[2]     Immediately thereafter, at a violation-of-probation (VOP) hearing, the court judicially noticed the verdicts and found defendant failed to comply with conditions of probation.

[3]     In connection with defendant's VOP case, the court revoked and then reinstated probation under the same terms and conditions.

We originally rejected defendant's claims and affirmed the judgment.

The California Supreme Court granted review and remanded the case to us with directions to vacate our decision and reconsider the cause in light of *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*). We have done so. We now conclude defendant "is entitled to a limited remand for the trial court to decide whether he should receive diversion under section 1001.36." (*Id*. at p. 625.)

## STATEMENT OF FACTS

Beginning on May 1, 2016, defendant lived with his girlfriend N.B. and her two minor daughters. On June 30, 2016, N.B. opened defendant's cell phone and found text messages to and from other women. She became upset and left the apartment with her children in tow because she did not want to be around him. N.B. subsequently texted defendant about her discovery. The two quarreled after she and her daughters returned to the apartment. Eventually, defendant's voice grew louder and he uttered profanity. He then "smashed [a tablet computer] on the table" and "punched his TV." N.B. became frightened. She went to her daughters' bedroom and attempted to pacify her children, who were also scared.

An hour later, when the commotion subsided, N.B. moved her daughters to her own bedroom. While the three were watching television to "get their mind off of what was going on," defendant entered. He "went into the closet to start grabbing his stuff" and "kept . . . cursing at [N.B.]." At one point, defendant "swung at [N.B.'s chin]." Although he "missed . . . what he was aiming for," he still scratched her right arm. Defendant was "verbally abusive and whatnot for about another few minutes" before he left the room. N.B. closed the door and ultimately fell asleep with her children.

On the morning of July 1, 2016, defendant reentered N.B.'s bedroom "arguing" and "cursing," which woke up N.B. He wanted her to drive him to the bank so he could withdraw some money he owed her and be "done with" her. N.B. agreed to do so and brought along her daughters. En route to the bank, defendant called N.B. "a bitch" and

3.

"an ugly motherfucker." He continued to curse on the ride home following the withdrawal.

After N.B. parked her vehicle, she, her children, and defendant made their way to their apartment. Defendant continued screaming. Because several neighbors were around, N.B. implored defendant to lower his voice. He responded, "I don't care about these neighbors, these neighbors could kiss my ass." At some point, N.B. said, "[J]ust stop already, it's enough, just stop." Defendant retorted, "[S]hut the fuck up before I fuck you up." N.B. was "shaken." Once inside the apartment, she instructed a neighbor via text message to call the police. When the neighbor asked whether "everything [was] okay," N.B. answered, "[N]o, I'm scared and I don't want to call the cops in front of [defendant]."

Approximately 15 to 20 minutes later, at or around 12:30 p.m., Fresno Police Officers Escareno and Yang arrived at the apartment. According to Escareno, N.B. "looked like she had been crying." Escareno questioned defendant while Yang escorted N.B. outside. During the interview, defendant "became a little bit more upset." He "started to raise his voice," "started to . . . clench his fists," "paced . . . back and forth," and "was a little animated." Defendant remarked "he hope[d] [N.B.] had made good allegations against him because when he got out, he was going to find her and he was going to fuck her up." He was taken into custody.

Between July 5 and July 26, 2016, defendant repeatedly phoned N.B. from jail. He told her to drop the charges.

## DISCUSSION

**I.** *Faretta* **motion**

    a. *Background*

On January 26, 2017, the public defender appearing on behalf of defendant declared a conflict of interest. The trial court relieved the public defender and appointed attorney Richard Esquivel to represent defendant in both the criminal prosecution and the VOP hearing (see *ante*, fn. 2). After the court scheduled a settlement conference on January 27, 2017, and tentatively scheduled a trial for January 30, 2017, defendant indicated he was unwilling to waive time and wanted to proceed with the VOP hearing. Esquivel—"against [defendant's] wishes"—asked the court to "trail [the VOP hearing] behind the trial case" because he was "not prepared to commit malpractice and go forward on a hearing that [he was] not prepared for." The court found good cause to "continue the VOP to January 30th to trail . . . the trial case . . . ."

At the January 27, 2017 hearing, Esquivel advised the court:

> "I spoke to [defendant] yesterday. I spoke[] to him today. It is his desire to go forward with trial. I've informed him that we're not prepared to go forward with trial and I would be requesting additional time to review the file, speak to him before going to trial. [¶] I believe it is his desire at this point to represent himself and go forward."

When the court asked whether Esquivel was correct, defendant stated, "Yes." The court instructed defendant to complete and file a document titled "**ADVISEMENT AND WAIVER OF RIGHT TO COUNSEL (Faretta Waiver)**." The document detailed several disadvantages of self-representation and the court's recommendation to accept appointed counsel, inter alia. Defendant signed the form, certifying he "read, understood, and considered all of the above warnings," "still want[ed] to represent [him]self," and "freely and voluntarily g[a]ve up [his] rights to have a lawyer represent [him]."

After the form was submitted, the following colloquy transpired in open court:

"THE COURT: . . . . [¶] . . . [W]e need to discuss the motion to represent yourself, we call it a *Faretta* motion because that's the case that established how we go about granting such a request. The law disfavors you representing yourself. [¶] [Do y]ou understand that . . . ?

"THE DEFENDANT: I understand.

"THE COURT: . . . . [¶] The Court would advise you that it is not in your best interest to represent yourself, that you should not do so but you have the right to represent yourself even after the Court admonishes that it's not in your best interest. It's certainly disfavored in the law for you to represent yourself. It's very difficult for you to do that. Even if you have a law degree the Court would be telling you not to do that. [¶] You understand that . . . ? [¶] . . . [¶]

"THE DEFENDANT: Yes.

"THE COURT: Do you understand that it's in your best interest to have counsel represent you?

"THE DEFENDANT: Yes.

"THE COURT: And despite all of that, you're still asking to represent yourself?

"THE DEFENDANT: Yes.

"THE COURT: The Court will allow you to represent yourself in this matter, then the Court will grant that motion." (Italics added.)

Defendant later clarified he wanted to represent himself in the VOP hearing only. The court granted the *Faretta* motion as to the VOP hearing; Esquivel was still appointed to represent defendant in the criminal prosecution. The court scheduled the trial and VOP hearing for February 6, 2017.

At the February 6, 2017 hearing, the following colloquy transpired:

"THE COURT: . . . . [¶] What's the status on the jury trial?

"MR. ESQUIVEL: Your Honor, I've just got assigned out on a case that times out before [defendant]'s. In addition, I simply wouldn't be prepared to go forward on this case at any rate. I have to review his discovery, make sure all the investigation has been done. I'm going to ask to trail this to the 9th and see where we are in our trial. [¶] . . . [¶]

6.

"THE COURT: . . . [Y]ou understand that request?

"THE [DEFENDANT]: I do understand it, and I'm not waiving any time. He's not prepared. I'm prepared to represent myself in both cases.

"THE COURT: Well, let me explain something . . . . Your case doesn't time out until February 14th.

"THE DEFENDANT: I know.

"THE COURT: So it is my intention to trail this case within time to February 9th. Are you making a request to represent yourself on [the criminal prosecution]?

"THE DEFENDANT: Correct. If he's not prepared, I got it."

Defendant submitted a second "**ADVISEMENT AND WAIVER OF RIGHT TO COUNSEL (Faretta Waiver)**" and the court conducted a hearing on the request later that afternoon. The following colloquy transpired:

"THE COURT: . . . . [¶] . . . [Y]ou have been through the issue of [the] *Faretta* [m]otion. The Court granted the motion for you to represent yourself in [the criminal prosecution], and then you brought it to my attention that you did not wish to represent yourself in [the criminal prosecution], only in the violation of probation case. [¶] Those circumstances have changed; is that correct . . . ?

"THE DEFENDANT: Correct.

"THE COURT: At this point in time you believe that you have the ability to represent yourself in the matter that's going to trial . . . . [¶] Is that correct?

"THE DEFENDANT: Correct.

"THE COURT: And . . . you understand that it will be your responsibility to do a number of things that generally an attorney would be doing for you, and that's, specifically, picking a jury, making determinations as to which, if any, motions need to be filed, motions in limine, in particular eliminating certain testimony. [¶] . . . [¶]

"THE DEFENDANT: Correct. [¶] . . . [¶]

7.

"THE COURT:  The Court previously told you that I would encourage you not to represent yourself, that it's not a smart move to represent yourself . . . , particularly in a felony matter, but in any type of proceeding, but you have read the form and it is still your request to represent yourself despite the Court's strong admonition that you not do so. [¶]  Is that correct?

"THE DEFENDANT:  Correct.

"THE COURT:  You are set for trial for tomorrow.  Are you confirming that trial tomorrow?

"THE DEFENDANT:  Yes.

"THE COURT:  The matter then is confirmed for trial.  [Defendant] is representing himself on tomorrow's date. . . .  [¶]  . . . You continue to represent yourself in the matter that's trailing, the misdemeanor violation of probation.  [¶]  Is that correct?

"THE DEFENDANT:  Correct.

"THE COURT:  And do you want that matter to continue to trail?

"THE DEFENDANT:  I would like that matter to be over with.

"THE COURT:  I understand that, and how would you like to go about having that matter over with?

"THE DEFENDANT:  Um, I guess I don't have no problem taking that to trial so, you know –

"THE COURT:  It is set tomorrow for –

"THE DEFENDANT:  Oh, okay, yeah.

"THE COURT:  – Contested Hearing, that's my recollection, so it's really not trailing, it's set tomorrow for Contested Hearing.

"THE DEFENDANT:  Okay."  (Italics added.)

On February 8, 2017, the second day of trial, the following colloquy transpired:

"THE COURT:  . . . .  [¶]  All right.  Now, the first issue I want to cover is that this will be a final opportunity . . . for you to let the Court know if you wish to have an attorney assist you.  I have discussed this with

you off the record. You have assured the Court that you wish to represent yourself. Is that correct?

"[THE DEFENDANT]: Correct.

"THE COURT: I've also discussed with you that you will be held to the same standards as any other attorney from a procedural standpoint, and the appropriate instruction will be read to the jury regarding that. [¶] I have also instructed you that once this trial commences, that I would treat any requests for continuance as I would any other attorney in your circumstance. Do you understand all of that?

"[THE DEFENDANT]: Yes.

"THE COURT: And if, in fact, during this trial you request the assistance of counsel, you have made this determination knowingly and intelligently, and you wish to proceed knowing that I would not stop the trial because of your request for counsel. Do you understand that, sir?

"[THE DEFENDANT]: Yes."

On February 15, 2017, the sixth day of trial, after the prosecution rested, the following colloquy transpired:

"THE COURT: What are we going to do, . . . ?

"[THE DEFENDANT]: Put me on the stand.

"THE COURT: Well, if you want to testify –

"[THE DEFENDANT]: I sure do.

"THE COURT: All right. Now, I caution you, . . . –

"[THE DEFENDANT]: I don't need no more of your caution. Let's get this done. I've been doing a pretty good job so far, not bad for a veteran with a brain injury. I know what I'm doing now, don't I? Thank you. I don't need any more of your caution. I'm ready to testify."

b. *Analysis*

" 'A criminal defendant has a right, under the Sixth Amendment to the federal Constitution, to conduct his own defense, provided that he knowingly and intelligently waives his Sixth Amendment right to the assistance of counsel. [Citations.] A defendant

9.

seeking to represent himself "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation.]" [Citation.]' " (*People v. Burgener* (2009) 46 Cal.4th 231, 240-241.)

Defendant contends his waiver was invalid because he was not warned about the maximum possible punishment that could be imposed if he were found guilty of the charged crimes. (See *People v. Jackio* (2015) 236 Cal.App.4th 445, 454-455.) Even assuming, arguendo, the trial court had an affirmative duty to admonish defendant about the maximum possible punishment, "we . . . reject defendant's contention that the omission of this single piece of information from the court's extensive colloquy with him about the hazards and risks of self-representation requires an automatic reversal." (*People v. Bush* (2017) 7 Cal.App.5th 457, 474 (*Bush*).)

"Although the denial of a proper request for self-representation has been determined to be structural error [citation], neither the federal Supreme Court nor the state Supreme Court has decided whether the granting of a request for self-representation based on an inadequate *Faretta* admonishment compels the same result. [Citations.] Our state courts that have addressed the question have applied the *Chapman*[4] harmless error standard. [Citations.] Although two California courts have applied automatic reversal following errors in allowing self-representation, the cases are readily distinguishable. In both instances the defendants received *no* self-representation warnings at all before being allowed to proceed without counsel. [Citations.]" (*Bush, supra,* 7 Cal.App.5th at p. 475, fns. omitted.)

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman, supra,* 386 U.S. at p. 24.) In the instant case, defendant exhibited his unwillingness to

---

**4**      *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

10.

waive time even though his then-counsel Esquivel was newly appointed and was not prepared to proceed. As to both the VOP hearing and the criminal prosecution, defendant completed and signed *Faretta* waiver forms certifying he was freely and voluntarily relinquishing his right to have an attorney represent him. At multiple hearings and even at trial, he maintained he wanted to represent himself even though the court warned him about the difficulties and disadvantages of doing so. "[T]he record as a whole . . . convinces us beyond a reasonable doubt that defendant knew what he was doing in requesting self-representation, made his choice with eyes open, and would have done the same even if the court had advised him specifically about the maximum potential [punishment] on conviction." (*Bush*, *supra*, 7 Cal.App.5th at p. 477, fn. omitted.)

## II.    Section 1001.36

In a supplemental brief, defendant argued for retroactive application of section 1001.36. On the basis of *People v. Craine* (2019) 35 Cal.App.5th 744, disapproved in part by *Frahs*, *supra*, 9 Cal.5th 618, we originally held that section 1001.36 did not apply retroactively to defendant's case.

Prior to *Frahs*, there was a split among the appellate districts regarding the retroactivity of section 1001.36. (See *Frahs*, *supra*, 9 Cal.5th at p. 631, fn. 2.) In *Frahs*, our Supreme Court found "neither the text nor the history of section 1001.36 clearly indicates that the Legislature intended that the *Estrada* rule[5] would not apply to this diversion program" (*id.* at p. 624) and held that the provision applies retroactively to cases in which judgment is not yet final on appeal (*ibid.*).

On June 27, 2018, after defendant was sentenced, but while his case was still pending on appeal, the Legislature enacted section 1001.36, which took effect

---

**5**    In *In re Estrada* (1965) 63 Cal.2d 740, the Supreme Court held that an amendatory statute lessening punishment for a crime was presumptively retroactive and applied to all persons whose judgments were not yet final at the time the statute took effect.

immediately.  (Stats. 2018, ch. 34, §§ 24, 37.)  Thus, in view of *Frahs*, section 1001.36 applies retroactively to the instant case.

"Having found that section 1001.36 applies retroactively, we must now consider the remedy."  (*Frahs*, *supra*, 9 Cal.5th at p. 637.)  In *Frahs*, the Supreme Court recognized "the record on appeal is unlikely to include information pertaining to several eligibility factors" "[w]hen . . . a defendant was tried and convicted before section 1001.36 became effective."  (*Id*. at p. 638; see § 1001.36, subd. (b)(1)(A)-( F) [criteria].)  Thus, "requiring defendants to show they would meet all threshold eligibility requirements before the appellate court may remand the case to the trial court—which decides in the first instance whether a defendant is eligible for diversion—would be inconsistent with any sensible retroactive application of the statute."  (*Frahs*, *supra*, at p. 638.)  The high court concluded "a conditional limited remand for the trial court to conduct a mental health diversion eligibility hearing is warranted when . . . the record affirmatively discloses that the defendant appears to meet at least the first threshold eligibility requirement for mental health diversion—the defendant suffers from a qualifying mental disorder [citation]."  (*Id.* at p. 640; see § 1001.36, subd. (b)(1)(A).)

Here, the record affirmatively discloses that defendant seems to suffer from a qualifying mental disorder.  Accordingly, a conditional limited remand for the court to conduct a mental diversion eligibility hearing is warranted.

## DISPOSITION

The judgment is conditionally reversed.  The cause is remanded to the trial court with directions to conduct a mental health diversion eligibility hearing pursuant to section 1001.36.  If the trial court determines defendant qualifies for diversion, it may grant diversion.  If defendant completes diversion, the court shall dismiss the charges.  On the other hand, if the court determines defendant is ineligible for diversion, or he does not successfully complete diversion, then his convictions and sentence shall be reinstated.  We express no view regarding whether defendant will be able to show eligibility on

12.

remand or whether the trial court should exercise its discretion to grant diversion if it finds him eligible. (Accord, *Frahs*, *supra*, 9 Cal.5th at p. 641.)