Filed 3/11/26  P. v. Price CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EUGENE LEON PRICE,<br><br>        Defendant and Appellant. | A174572<br><br>(San Joaquin County Super. Ct. No. STK-CR-FE-2023-0006940) |

Defendant contends the judgment against him must be reversed because: (1) the trial court obtained an inadequate waiver of his constitutional right to counsel; and (2) the evidence of specific intent was insufficient as a matter of law to support one of his convictions for attempted first degree murder.[1]  We remand the matter for correction of the abstract of judgment but otherwise affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

An information was filed charging defendant Eugene Leon Price with: two counts of willful, deliberate, and premeditated attempted murder (Pen. Code,[2] §§ 664/187, subd. (a); counts 1 and 2) with firearm use enhancements

---

[1]     This matter was transferred to the First Appellate District from the Third Appellate District by order of the California Supreme Court filed on October 15, 2025.

[2]     All unlabeled statutory references are to this code.

1

(§§ 12022.53, subds. (b), (c)); two counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 3 and 4) with firearm use enhancements (§ 12022.5, subd. (a)); shooting at an occupied vehicle (§ 246; count 5) with a firearm use enhancement (§ 12022.5, subd. (a)); and carrying a loaded firearm while in a public place (§ 25850, subd. (a); count 6).  As to counts 1 through 5, the information alleged aggravating circumstances pursuant to rule 4.421 of the California Rules of Court.

In September 2023, criminal proceedings were suspended for defendant to undergo competency evaluations.  (§§ 1368, 1369.)  On November 9, 2023, the trial court accepted the parties' stipulation that defendant was competent to stand trial, and criminal proceedings were reinstated.  On November 16, 2023, the court granted defendant's motion for self-representation pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

The People's evidence at trial included witness testimony and video recordings establishing the following.  Stephen S. and his cousins Abigail H. and Zachary H. resided together with others at a home in Stockton.  Defendant lived in a small apartment complex next door.  On June 17, 2023, defendant got into an altercation with a group including Zachary and Stephen, who were socializing across the street from defendant's home.  After being repeatedly told to leave, defendant went to his apartment.  He returned about five minutes later and again confronted the group.  Defendant eventually punched Zachary in the face, so Stephen punched defendant and got into a fistfight with him.  Defendant ignored Stephen's attempts to calm him as they fought.  The fight ended when an unknown person pulled up in a car and told Stephen to leave defendant alone.

Stephen, Abigail, Zachary, and others then went to a park for an hour or so.  Upon returning home, Stephen, Abigail, and Zachary prepared for an

evening in San Francisco. Abigail and Stephen were waiting in Abigail's car for Zachary, with Abigail in the driver's seat and Stephen in the front passenger seat, when defendant and his friend walked toward them.

As defendant advanced toward the driver's side of the car, Stephen saw him retrieve a gun from his waistband. Stephen testified defendant pointed the firearm directly at his head and fired. Abigail was "directly between" defendant and Stephen, with her car door open, when defendant began firing shots in rapid succession. Abigail testified Stephen was in the car and froze when the shooting started, but he then got out and ran. Jeff S. testified he was sitting on the porch of the victims' house when he saw defendant and his friend approach Abigail's car. Defendant removed a gun from his waistband and pointed it at the car, and Jeff heard four shots fired in rapid succession. Jeff saw defendant fire his first shot at window- or headrest-level before he (Jeff) turned and ran into the house.[3]

Stephen quickly exited the car and tried to run away, but he tripped and fell. Defendant walked around the car and stood over Stephen, who was begging for his life, and fired another round less than a foot from Stephen's left ear. Defendant called Stephen a "bitch ass [N-word]" before walking around the driver's side of Abigail's car and leaving. Though the firearm used in the shooting was never located or found, a search of defendant's home disclosed evidence linking defendant to the .40-caliber shell casings recovered from the crime scene. And gun ownership records indicated defendant owned a .40-caliber firearm.

Defendant testified in his own defense. Among other things, he claimed he was walking to a store with a friend when a "guy" walked up and

_____

[3] The People presented Jeff's preliminary hearing testimony, as he was unavailable at the time of trial.

3

called his name before shots rang out. After the shooting stopped, defendant saw the guy walk away. Defendant walked over to Stephen, who was on the ground, and said " 'You're a fucking bitch, bro' " before walking away. Defendant denied pulling out a gun or shooting at Stephen and Abigail, and he claimed the video recordings had been altered. He also claimed he sold his gun in Las Vegas in 2011.

The jury found defendant guilty on all charges and firearm enhancements. In a bifurcated trial, the jury also found true the alleged aggravating circumstances as to counts 1 through 5.

In March 2024, the trial court sentenced defendant to an aggregate term of 54 years to life in state prison: two consecutive terms of seven years to life in prison for counts 1 and 2[4] and two 20-year terms for the firearm enhancements for counts 1 and 2. The sentences for counts 3, 4, 5, and 6 were stayed under section 654. The court also imposed various fines, fees and assessments and awarded custody and conduct credits.

## DISCUSSION

Defendant advances two principal bases for reversal of his judgment: (1) the trial court obtained an inadequate waiver from defendant of his right to counsel under Sixth and Fourteenth Amendments; and (2) the evidence of

---

[4] Contrary to the trial court's oral pronouncement at the sentencing hearing, the abstract of judgment filed on March 27, 2024, incorrectly refers to defendant's sentence on count 2 as running concurrently with the sentence on count 1, instead of consecutively . Defendant does not dispute that the court orally sentenced him to an aggregate term of 54 years to life. Accordingly, we shall remand the matter to the trial court with directions to prepare an amended abstract of judgment reflecting the court's oral pronouncement.

4

specific intent was insufficient as a matter of law to support his conviction for attempted murder of Abigail (count 2).

**A. Defendant's Waiver of the Right to Counsel**

"A criminal defendant has a constitutional right to counsel at all critical stages of a criminal prosecution." (*People v. Doolin* (2009) 45 Cal.4th 390, 453.) A defendant, however, may waive that right and move to self-represent pursuant to *Faretta, supra,* 422 U.S. 806. Nonetheless, "[b]ecause the right to counsel is self-executing and persists unless the defendant affirmatively waives the right, the court must indulge every reasonable inference against such a waiver." (*People v. Boyce* (2014) 59 Cal.4th 672, 703 (*Boyce*).)

A defendant's request to self-represent must be honored if the following criteria are met: (1) the defendant is mentally competent and makes the request knowingly and intelligently after being apprised of the dangers of self-representation; (2) the request is unequivocal; and (3) the request is timely. (*People v. Stanley* (2006) 39 Cal.4th 913, 931–932; see *Boyce, supra,* 59 Cal.4th at p. 702.) "[T]he likelihood or actuality of a poor performance" by a self-represented defendant does not defeat the right to represent oneself. (*People v. Taylor* (2009) 47 Cal.4th 850, 866.) In this case, there is no question that defendant was mentally competent and made an unequivocal and timely waiver. The issue is whether his waiver was knowing and intelligent.

The purpose of requiring a knowing and intelligent waiver is to ensure the defendant understands the significance and consequences of the decision to self-represent. (See *People v. Noriega* (1997) 59 Cal.App.4th 311, 319 (*Noriega*).) To this end, courts should provide so-called *Faretta* advisements to explain " ' "the dangers and disadvantages of self-representation." ' "

5

(*People v. Burgener* (2009) 46 Cal.4th 231, 241 (*Burgener*).) "On appeal, we independently examine the entire record to determine whether the defendant knowingly and intelligently waived the right to counsel." (*Ibid*.)

Though the Sixth Amendment does not require a "particular form of words" for *Faretta* advisements, the record as a whole must demonstrate "the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1070 (*Koontz*).)

In *Noriega*, *supra*, 59 Cal.App.4th 311, for example, the Court of Appeal concluded the appellant's waiver of counsel was invalid because the trial court "gave no specific warnings or advisements regarding the risks and dangers of self-representation." (*Id*. at p. 319.) As *Noriega* explained, "[t]he court did not inquire whether appellant understood the charges against him and the potential penal consequences if he lost at trial. The court did not warn him the trial court would treat him like any other attorney and that he could expect no special treatment or advice from the court during his trial. The court did not point out appellant's lack of legal skills and the fact his opponent at trial would be both experienced and prepared. The court did not advise appellant he had no right to either standby, advisory or cocounsel in the event he decided to represent himself. [Citations.]" (*Id*. at pp. 319–320; see *Burgener*, *supra*, 46 Cal.4th at p. 243 [citing *Noriega*].) "In short," *Noriega* concluded, "the trial court did not give any necessary warnings to assure itself appellant was making an informed and intelligent decision to represent himself despite the disadvantages and risks of that choice." (*Noriega*, at p. 320.)

Here, there is no dispute the trial court gave all the advisements that were omitted in *Noriega*. Additionally, the court warned defendant that

6

(1) his "pro per privileges may be limited and restricted" or "eliminated entirely" if he were to misbehave; (2) his misconduct resulting in elimination of his pro per status would put his new attorney at a disadvantage; and (3) he would not be able to appeal on the grounds he did not know what he was doing. The court also cautioned defendant that he would be "exposed to the dangers and disadvantages of not knowing the complexity of jury selection" and of other aspects of a trial, such as the bounds of a permissible opening statement and closing argument to the jury; the rules of evidence and appropriate direct and cross-examination; and the post-trial motions that would be necessary to preserve his rights on appeal. The record shows that defendant affirmatively confirmed his understanding of all these advisements.

Despite all this, and homing in on *Noriega*'s point that a defendant should be advised of "the potential penal consequences" if he loses at trial (*Noriega*, *supra*, 59 Cal.App.4th at p. 319), defendant contends his waiver of the right to counsel was not knowing and intelligent because the written *Faretta* form he executed erroneously stated he faced a minimum sentence of 10 years, when the form should have listed the minimum sentence as life in prison with the possibility of parole in seven years. According to defendant, incorrect information about the minimum possible sentence is likely to lead a defendant to "believe the consequence of being found guilty will not be that bad and result in the defendant foolishly taking the gamble of self-representation." We see no basis for relief.

As a preliminary matter, we question defendant's factual premise that the minimum sentence he faced was life in prison with the possibility of parole in seven years. Indeed, a jury finding of not guilty on all charges would have meant no sentence at all. Moreover, as the People indicate, a

7

jury verdict of not guilty on the attempted murder counts but guilty on only one of the other charges (and rejection of the firearm enhancements) would have subjected defendant to a minimum sentence of three years for assault with a semiautomatic firearm (§ 245, subd. (b)), three years for shooting at an occupied vehicle (§ 246), or 16 months for carrying a loaded firearm in a public place (§ 25850).

More to the point, there appears no per se requirement that a defendant be advised of the potential punishment before waiving the right to counsel and proceeding to trial unrepresented. Rather, California Supreme Court precedent is clear that the totality of the record must be assessed in determining whether "the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." (*Koontz*, *supra*, 27 Cal.4th at p. 1070.)

Here, the record as a whole amply establishes that defendant possessed the requisite understanding. As recounted above, the trial court thoroughly admonished defendant of the dangers and disadvantages of self-representation at the *Faretta* hearing, and defendant does not otherwise dispute the adequacy of those admonishments. His sole contention—unsupported by any California authority—is that his waiver cannot be deemed knowing and intelligent because he was not properly advised of the minimum possible sentence he faced.

We acknowledge California courts have indicated that a defendant's knowledge of "potential penal consequences" may be an important consideration in assessing the validity of a *Faretta* waiver. (*Noriega*, *supra*, 59 Cal.App.4th at p. 319; see *People v. Best* (2020) 49 Cal.App.5th 747, 764 (*Best*).) However, defendant's singular focus on the supposedly incorrect *minimum* punishment information stated in his *Faretta* form disregards clear

8

indications in the record that he understood the dangers of self-representation and the possibility of severe punishment—life in prison—if he were to proceed to trial without counsel and be convicted.[5]  Not only did the trial court conduct a thorough *Faretta* colloquy with defendant, but as the court observed, two doctors' reports had recently opined, in the context of finding defendant mentally competent to stand trial, that he demonstrated "an understanding of his present charges and his legal situation," "an appreciation of the possible penalties if found guilty as charged," and "an understanding of most of the available defenses."  Based on our review of the entire record, we are satisfied defendant validly waived his right to counsel with a full understanding "the dangers and disadvantages of self-representation." (*Faretta, supra*, 422 U.S. at p. 835; *Koontz, supra*, 27 Cal.4th at p. 1070.)

## B. Count 2:  Attempted Murder of Abigail

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended

---

[5]    Courts in California have not clearly required that defendants be affirmatively advised of the *maximum* potential punishment they face if convicted.  (See *People v. Jackio* (2015) 236 Cal.App.4th 445, 455–456 [upholding adequacy of court's advisement of the maximum potential penalty]; see also *Best, supra*, 49 Cal.App.5th at p. 764 [suggesting no such requirement but commenting "the better practice" is "to provide this information"]; *People v. Bush* (2017) 7 Cal.App.5th 457, 473 [concluding *Jackio*'s analysis did not consider "whether a warning about the maximum potential penalty is always required for a valid waiver of the right to representation at trial"].)  Notably, however, there is no case law requiring advisement of a *minimum* potential punishment, which, as indicated, may in fact be no punishment at all in the event of a complete acquittal.  In any event, defendant does not dispute that he was advised—at least twice—and that he understood he faced a *maximum* possible sentence of life in prison if he were to be convicted of all charged crimes.

killing." (*People v. Ervine* (2009) 47 Cal.4th 745, 785.) Here, the jury found defendant guilty of attempted first degree murder of Stephen (count 1) and attempted first degree murder of Abigail (count 2). While conceding there was substantial evidence that he acted with specific intent to kill Stephen, defendant contends the evidence was insufficient to establish the requisite specific intent to kill Abigail.[6] Pointing to the evidence that Abigail was not involved in his initial altercation with Zachary and Stephen, defendant argues Abigail was "simply . . . in the way and at the wrong place at the wrong time" when "he attempted to exact his revenge on Stephen." We are not persuaded.

The California Supreme Court's analysis in *People v. Smith* (2005) 37 Cal.4th 733 (*Smith*) illustrates the fallacy of defendant's reasoning. In *Smith*, a mother was sitting in the driver's seat of her parked car, and her baby was in a car seat directly behind her. (*Smith*, at pp. 736–737.) The defendant walked up to the car and looked inside the open front passenger window, then made a threatening remark to the mother. (*Id.* at p. 737.) When the mother's boyfriend approached the car after hearing the defendant's remark, the defendant and others began hitting him. (*Ibid.*) The boyfriend was able to enter the mother's car, and she started pulling away from the curb. (*Ibid.*) The car was about one car length away when the defendant fired a single "large-caliber bullet" (*id.* at p. 746) "from a position directly behind the car" (*id.* at p. 743). Though the bullet "missed both the baby and the mother by a matter of inches," "it shattered the rear windshield,

---

6      Defendant challenges his conviction on count 2 solely on the ground that the evidence failed to prove he had the specific intent to kill Abigail. He offers no independent argument concerning the jury's related finding that the attempted murder was committed willfully, deliberately, and with premeditation. We limit our discussion accordingly.

passed through the mother's headrest, and lodged in the driver's side door." (*Ibid*.) The defendant was charged with attempted murder of the mother and attempted murder of the baby, and a jury convicted him on both counts. (*Id*. at p. 738.)

The defendant did not challenge his conviction for attempted murder of the mother. But he contended the conviction for attempted murder of the baby required reversal because "he fired only one bullet into the vehicle," which reflected his intent to kill only the mother, and " 'there was no proof of animus toward the baby.' " (*Smith, supra*, 37 Cal.4th at p. 738.) In analyzing the requisite mental state, *Smith* started by recognizing the crime of attempted murder requires the specific intent to kill; it then invoked established case law holding that "[i]ntent to unlawfully kill and express malice are, in essence, 'one and the same,' " and that "[e]xpress malice requires a showing that the assailant ' " 'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' " ' " (*Id*. at p. 739.)

*Smith* ultimately concluded that, "in order for the jury to convict defendant of the attempted murder of the baby, it had to find, beyond a reasonable doubt, that he acted with intent to kill that victim, i.e., that he purposefully shot into the vehicle with 'a deliberate intent to unlawfully take away [the baby's] life' [citation] or knowledge that his act of shooting into the vehicle would, ' " 'to a substantial certainty,' " ' result in the baby's death. [Citation.]" (*Smith, supra*, 37 Cal.4th at p. 743.) *Smith* determined these requirements were met, as the defendant's "very act of discharging a firearm into the car from close range and narrowly missing both mother and baby could itself support such an inference." (*Id*. at p. 744.)

In assessing defendant's substantial evidence claim through the lens of *Smith*, we must view the evidence in the light most favorable to the People and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Applying this standard, we highlight the following evidence at trial. Defendant drew a firearm as he advanced toward the driver's side of a parked car in which Abigail sat in the driver's seat and Stephen sat in the front passenger seat. Abigail's car door was open when defendant started shooting at the two from behind Abigail, and witness testimony uniformly established that the first four shots were fired in rapid succession. Defendant shot into the car at Abigail and Stephen at "window" or "headrest" level, as opposed to "up higher,"[7], and he did so while he was no more than 12 feet away. On this record, and even more so than in the situation in *Smith*, substantial evidence established that defendant acted with express malice when shooting at Abigail, and the conviction for his attempted murder of her must stand. (See *People v. Mincey* (1992) 2 Cal.4th 408, 432 [reviewing court determines whether substantial evidence supports the verdict, "not whether the evidence proves guilt beyond a reasonable doubt"].)

Defendant cites *People v. Boatman* (2013) 221 Cal.App.4th 1253 for the proposition that facts about his prior relationship and/or conduct with Abigail are relevant in determining whether he intended to kill her. In his view, the evidence of his pursuit of Stephen after Stephen exited the car, and the lack of any evidence that he targeted Abigail just as he targeted Stephen or otherwise harbored any personal animus against her, compel the conclusion

---

[7]     Defendant's appellate briefing appears to acknowledge the evidence showed he discharged his firearm at headrest-level while both victims were sitting in the car and Abigail's door was open.

12

that the evidence was insufficient to prove he had the specific intent to kill her. We cannot agree.

As discussed, the evidence showed that defendant purposefully fired four shots—at close range and in quick succession—from a semiautomatic weapon at headrest level into the car where Abigail sat with her door open, and that he did so without legal excuse. On this record, substantial evidence supports the conclusion that defendant purposefully acted with either " 'a deliberate intent to unlawfully take away [Abigail's] life' [citation] or knowledge that his act of shooting into the vehicle would, ' " 'to a substantial certainty,' " ' result in [her] death. [Citation.]" (*Smith, supra*, 37 Cal.4th at p. 743.) That the evidence did not show a particular motive on defendant's part for shooting at Abigail is not dispositive, nor is the circumstance that his bullets missed hitting her. (*Id*. at p. 742.)

In sum, we conclude substantial evidence supports defendant's conviction for the attempted murder of Abigail.

## DISPOSITION

The matter is remanded with directions to the trial court to prepare an amended abstract of judgment correctly reflecting the court's oral pronouncement of sentencing (see *ante*, at fn. 4). In all other respects, the judgment is affirmed.

13

_____

Fujisaki, J.

WE CONCUR:


_____

Tucher, P. J.


_____

Rodríguez, J.


*People v. Price* (A174572)

14